No. 24-10793
**CAPITAL CASE**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

WILLIE JAMES PYE,
Appellant,

v.

TYRONE OLIVER, Commissioner, Georgia Department of Corrections,
CHRISTOPHER CARR, in his official capacity as the Attorney General of
the State of Georgia,
STATE BOARD OF PARDONS AND PAROLES,
SHAWN EMMONS, Warden, Georgia Diagnostic & Classification Prison
Appellees.
_____

On Appeal from the United States District Court
Northern District of Georgia, No. 3:24-CV-00048-TCB
_____

**BRIEF OF APPELLANT WILLIE JAMES PYE**
_____

Nathan A. Potek
FEDERAL DEFENDER PROGRAM, INC.
Suite 1500, Centennial Tower
101 Marietta Street, N.W.
Atlanta, Georgia 30303
(404) 688-7530/Nathan_Potek@fd.org
Counsel for Willie James Pye

No. 24-10793
*Pye v. Oliver, et al*

## CERTIFICATE OF INTERESTED PARTIES

Counsel hereby certifies that the following listed persons and entities described in 11th Cir. R. 26.1 may have an interest in the outcome of this case:

Adams, Chester, Mr. Pye's codefendant

Bailey, Hon. John H., Northern Judicial Circuit, state habeas judge

Batten, Sr., Hon. Timothy, United States District Court Judge

Benton, S. Jill, federal habeas counsel for Mr. Pye

Carr, Christopher, in his official capacity as the Attorney General of the state of Georgia

Coker, Benjamin, Spalding County District Attorney

Dunn, Mildred Geckler, Acting Executive Director, Federal Defender Program, Inc.

Dunn, Thomas H., state habeas counsel for Mr. Pye

Emons, Shawn, Warden, Georgia Diagnostic & Classification Prison

Freeman, Anthony, Mr. Pye's codefendant

i

No. 24-10793
*Pye v. Oliver, Commissioner*

Graham, Sabrina D., counsel for Appellee

Kammer, Brian S., state habeas counsel for Mr. Pye

Kearns, Stephanie A., Former Executive Director, Federal Defender Program, Inc.

McBroom, William, former Spalding County District Attorney

Mostiler, Johnny B. (deceased), trial counsel for Mr. Pye

Oliver, Tyrone, Commissioner, Georgia Department of Corrections

Potek, Nathan, counsel for Appellant

Pye, Willie James, Appellant

Schiefer, Theresa, former counsel for Appellee

Singh, Channell, former counsel for Appellee

Stork, Gretchen, federal habeas counsel for Mr. Pye

Tangum, Richard, former counsel for Appellee

Vosburg-Casey, Amy, state habeas counsel for Mr. Pye

Whalen, Hon. Andrew (deceased), Superior Court of Spalding County, Georgia, trial judge

Yarbrough, Alicia Lynn (deceased), victim

No publicly traded company or corporation has an interest in the outcome of the case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a), Eleventh Circuit Rule 28-1(c) and Eleventh Circuit Rule 22, I.O.P. 2.  This is a capital case brought in the district court under 42 U.S.C. § 1983 raising several complex constitutional claims, and counsel believes that oral argument will assist the Court in its resolution of the case.

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................iv

TABLE OF CITATIONS ...........................................................................vi

STATEMENT OF JURISDICTION ..............................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE........................................................................2

A. Course of Proceedings and Disposition of the Case. ........................2

B. Statement of Relevant Facts ..............................................................3

    1.  The Agreement .............................................................................3

    2.  The State Breaches the Agreement ..............................................8

C. Standard of Review .........................................................................11

SUMMARY OF THE ARGUMENT ........................................................11

ARGUMENT AND CITATION OF AUTHORITY................................13

I.  THE DISTRICT COURT MISCHARACTERIZED MR. PYE'S
    EQUAL PROTECTION CLAIM AS A "CLASS-OF-ONE"
    CLAIM AND THEN MISAPPLIED THE LAW. ....................................13

A. Mr. Pye is Similarly Situated to the Favored Class of Death
    Row Prisoners. ................................................................................16

II. THE DISTRICT COURT DENIED A SUBSTANTIVE DUE
    PROCESS CLAIM THAT MR. PYE NEVER RAISED.........................26

CONCLUSION..........................................................................................36

CERTIFICATE OF COMPLIANCE AND SERVICE.............................37

<u>TABLE OF CITATIONS</u>

**Supreme Court Cases**

*Ashcroft v. Iqbal*,
   566 U.S. 662 (2009)...................................................................................13

*Cf. Harbison v. Bell*,
   556 U.S. 180 (2009)...................................................................................30

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)...................................................................................14

*Engquist v. Oregon Dep't of Agr.*,
   553 U.S. 591 (2008)............................................................................ 14, 16

*Evitts v. Lucey*,
   469 U.S. 387 (1985)............................................................................ 27, 35

*Griffin v. Illinois*,
   351 U.S. 12 (1956).....................................................................................26

*M.L.B. v. S.L.J.*,
   519 U.S. 102 (1996)............................................................................ 21, 22

*Morrissey v. Brewer*,
   408 U.S. 471 (1972)...................................................................................27

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
   508 U.S. 656 (1993)...................................................................................26

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992).......................................................................................17

*Ohio Adult Parole Auth. v. Woodard*,
   523 U.S. 272 (1998)..................................................................... 19, 27, 29

*Pennsylvania v. Finley,*
    481 U.S. 551 (1987)................................................................27

*Plyler v. Doe,*
    457 U.S. 202 (1982)................................................................20

*Ross v. Moffitt,*
    417 U.S. 600 (1974)................................................................15

*Schweiker v. Wilson,*
    450 U.S. 221 (1981)................................................................22

*Skinner v. State of Oklahoma ex rel. Williamson,*
    316 U.S. 535 (1942)................................................................23

*Swarthout v. Cooke,*
    562 U.S. 216 (2011)........................................................ 27, 29

*Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000)................................................................14

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)................................................................20

*Yates v. Aiken,*
    484 U.S. 211 (1988)................................................................29

*Zobel v. Williams,*
    457 U.S. 55 (1982)................................................................22

**Federal Cases**

*Arthur v. Thomas,*
    674 F.3d 1257 (11th Cir. 2012) ........................................13

*Cf. Arthur v. Comm'r, Alabama Dep't of Corr.,*
    680 F. App'x 894 (11th Cir. 2017) (unpublished) ........................19

*Checker Cab Operators, Inc. v. Miami-Dade Cnty.*,
    899 F.3d 908 (11th Cir. 2018) ...................................................................16

*Gissendaner v. Comm'r, Georgia Dep't of Corr.*,
    794 F.3d 1327 (11th Cir. 2015) ................................................................19

*Jackson v. BellSouth Telecommunications*,
    372 F.3d 1250 (11th Cir. 2004) ................................................................11

*Pye v. Warden, Ga. Diagnostic Prison*,
    2023 WL 386289 (11th Cir. 2023) ...........................................................24

*Pye v. Warden, Ga. Diagnostic Prison*,
    50 F.4th 1025 (11th Cir. 2022) .................................................................24

*Pye v. Warden, Ga. Diagnostic Prison*,
    853 Fed. Appx. 548 (11th Cir. 2021) (vacated)........................................24

*Williams v. Pryor*,
    240 F.3d 944 (11th Cir. 2001) ..................................................................19

*Worthy v. City of Phenix City, Alabama*,
    930 F.3d 1206 (11th Cir. 2019) ................................................................29

### State Cases

*State v. Fed. Def. Program, Inc.*,
    315 Ga. 319 (2022) ............................................................. 9, 10, 34, 35

### Federal Statutes

28 U.S.C. § 1291..........................................................................................1

42 U.S.C. § 1983........................................................................................1, 2

Fed. R. Civ. P. 12(b)(6) ............................................................................13

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment of the United States District Court for the Northern District of Georgia denying Appellant's Motion for a temporary restraining order and granting Defendants' motion to dismiss. The district court had jurisdiction over the case pursuant to 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1) Whether Defendants' creation of two classes of death row prisoners in Georgia: (1) those whom the State agrees cannot be executed until it can satisfy the baseline conditions necessary to ensure adequate representation in clemency proceedings and pre-execution litigation and (2) an identically situated class of death-row prisoners, including Mr. Pye, who were not granted those protections, violates Mr. Pye's Fourteenth Amendment right to Equal Protection?

2) Whether Defendants' arbitrary extension of critical procedural protections to some, but not all, death row prisoners violates Mr.

1

Pye's right to Due Process under the Fifth and Fourteenth

Amendments?

## STATEMENT OF THE CASE

A.    **Course of Proceedings and Disposition of the Case.**

On March 11, 2024, Mr. Pye filed a Complaint pursuant to 42 U.S.C. §

1983 in the United States District Court for the Northern District of Georgia

alleging violations of his equal protection and due process rights. Doc. 1.

Mr. Pye sought declaratory and injunctive relief. *Id.* Mr. Pye

simultaneously filed a motion for a temporary restraining order or

preliminary injunction preventing his execution. Doc. 3.

Defendants filed a pre-answer motion to dismiss and response to

Plaintiff's Complaint on March 13, 2024. Doc. 8. Mr. Pye filed his reply in

support of his motion for a TRO on March 14, 2024. Doc. 10. Following a

motions hearing on March 15, 2024, the District Court entered an order

denying Mr. Pye's motion for a TRO and dismissing Mr. Pye's Complaint.

Doc. 12 ("Order"). Mr. Pye is simultaneously filing an emergency motion

for an order staying execution pending appeal which he incorporates by

reference herein.

B.      **Statement of Relevant Facts**

1.      **The Agreement**

In response to the COVID-19 pandemic, Georgia Supreme Court
Chief Justice Harold Melton, in his capacity as the chair of the Judicial
Council of Georgia, issued an order creating the Judicial COVID-19 Task
Force ("the Task Force") on May 14, 2020. The Task Force's "mission [was
to] assist[] courts in conducting remote proceedings and in restoring more
in-court proceedings, in particular jury trials and grand jury proceedings."[1]
The Task Force's membership consisted of judges from all levels of the
state judiciary and designees from several stakeholder organizations such
as the Georgia Department of Law, the Georgia Public Defender Council,
the Georgia Association of Criminal Defense Lawyers ("GACDL"), and the
Prosecuting Attorneys' Council. The Task Force created several sub-
committees, including the Criminal Matters Sub-Committee ("Sub-

---

[1] Order Establishing Judicial COVID-19 Task Force,
https://georgiacourts.gov/wp-content/uploads/2020/05/Judicial-
COVID-19-Task-Force.pdf.

Committee"), which focused on issues related to COVID-19's effect on the criminal legal system in Georgia.

In the late summer and early fall of 2020, the Task Force asked for suggestions from stakeholders and advisory committee members about how to address concerns within the criminal legal system. The capital defense bar was most concerned with how the challenges of COVID-19 impaired their ability to effectively represent their clients facing potential execution.

First, the pandemic made it difficult for the Federal Defender to prioritize clemency investigations among their clients. Executions had been halted early in 2020, but because federal habeas proceedings continued even after the onset of the pandemic, multiple clients of the Federal Defender became eligible for execution and for clemency. Previously, the completion of habeas proceedings provided a clear indication of who the Attorney General would seek to execute next. As a result, and based on the order in which habeas proceedings concluded, the Federal Defender could prioritize finalizing clemency investigations for prisoners whose execution warrants were likely to issue. But the COVID-19-related backlog prevented

4

the Federal Defender from being able to accurately assess how to prioritize clemency investigations among their clients.

Furthermore, preparing for clemency proceedings requires a significant amount of work that must be completed close in time to the clemency hearing. Counsel is ethically bound to perform a thorough, contemporaneous investigation into all aspects of their client's background, condition, culpability, and legal case. And, of course, that thorough investigation is essential to presenting the best possible case for clemency, the last resort to avoid execution. Because this inquiry focuses on the client's current character, actions, prison behavior, and physical and mental condition, any investigation performed years earlier in conjunction with the legal proceedings is inadequate to form the basis of a clemency presentation. In addition, changed facts, newly discovered evidence, advances in forensic science, and changes in the law may give rise to new legal claims. Consequently, investigation of a late-stage capital case requires substantial face-to-face meetings with the client and potential lay witnesses, consultation with expert witnesses, and exhaustive records

collection. This process was rendered more difficult, and in some instances impossible, in the wake of the restrictions imposed during the pandemic.

In the fall of 2020, the Georgia Association of Criminal Defense Lawyers ("GACDL") prepared draft legislation to address the capital defense bar's concerns. The draft legislation would have required Defendants to provide (1) a six-month notice period before seeking any execution warrant post-pandemic, (2) a minimum time between execution warrants once certain conditions had been met, and (3) notice to the prisoner and their counsel and an opportunity to be heard before any execution warrant issued.

Instead of recommending judicial orders or legislation to address these issues, the Criminal Matters Sub-Committee asked the Attorney General and the capital defense bar, including representatives of the Federal Defender, to work together to develop an agreement on the terms under which the State of Georgia would resume executions.

Over the next few months, representatives of the State and representatives of the capital defense bar negotiated a potential agreement. Ultimately, on April 14, 2021, the parties reached a written agreement. The

6

Agreement was memorialized in an email from Deputy Attorney General

Beth Burton, asserting that "this email serves as the agreement," and was

confirmed on the same day by representatives of the capital defense bar.

The email states:

> Anna, instead of a formal MOU, we will agree, and this email serves as the agreement, that:
>
> Our office will not pursue an execution warrant from the District Attorney in the below defined cases before: 1) the final COVID19 judicial emergency order entered by the Chief Justice of the Supreme Court of Georgia expires; 2) the Georgia Department of Corrections lifts its suspension of legal visitation, and normal visitation resumes; and a vaccination against COVID19 is readily available to all members of the public.
>
> After these Conditions are met, and no earlier than August 1, 2021, our office intends to request an execution warrant for Billy Raulerson. We will provide Raulerson's counsel with notice of at least three months after the three-above conditions are met before pursuing an execution warrant. Our office will also ask the District Attorney to seek the maximum warrant period of 20 days for the warrant. Our office will not pursue an execution warrant of any prisoner other than Mr. Raulerson before a total of at least six months after the time the above-three conditions are met. Upon the expiration of this six-month period, we will ask each District Attorney to seek the maximum warrant period of 20 days and will wait no less than 30 days before pursuing each subsequent warrant.
>
> This agreement applies only to death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order, and will remain in effect only through August 1, 2022, or one year from the date on which the above-three conditions are met, whichever is later.
>
> Also, we will not seek to obtain a warrant for Michael Nance form the District Attorney until the United States Supreme Court has denied a request of certiorari from the Eleventh Circuit Court of Appeals of his § 1983 litigation (originating in the United States District Court for the Northern District of Georgia, USDC-NDGA Case No. 20-cv-107) concerning an as-applied challenge to his execution by lethal injection.
>
> This agreement is made with the understanding that the District Attorney maintains the sole authority to obtain an execution warrant.
>
> Beth

The next day, on April 15, 2021, the Agreement was formally

announced to the Criminal Matters Sub-Committee. As a result, the Sub-

Committee and the Task Force ceased its work on the conditions under

which executions would resume in Georgia.

2.    **The State Breaches the Agreement**

On April 25, 2022, a little over a year after finalizing the Agreement, the Attorney General's office informed the Federal Defender, counsel for Virgil Presnell, that they intended to seek an execution warrant for Mr. Presnell.  Two days later, on April 27, 2022, the Superior Court of Cobb County entered an execution order for Mr. Presnell and the Department of Corrections ("DOC") subsequently scheduled his execution for May 17, 2022.

On May 9, 2022, the Federal Defender filed a complaint against the State in the Fulton County Superior Court alleging a breach of the Agreement and seeking a temporary restraining order and an interlocutory injunction in order to stay Mr. Presnell's scheduled execution.[2]

At a hearing held in the Fulton County Superior Court on May 16, 2022, the Federal Defender conceded that the first condition—the expiration of the final COVID-19 judicial emergency order—had been satisfied but contended that the second and third conditions—the

---

[2] On May 13, 2022, Mr. Presnell, represented by the Federal Defender, filed a motion to intervene as a plaintiff, which was granted by the trial court.

8

resumption of "normal visitation" and the availability of a vaccine for "all

members of the public"—had not yet been satisfied. The Federal Defender

further contended that the State had breached the Agreement by giving

counsel for Mr. Presnell two days' notice of its intent to pursue an

execution order, instead of waiting until six months after the three

conditions had been satisfied before seeking such an order.

The trial court orally granted the Federal Defender's motion for a

temporary restraining order and an interlocutory injunction at the hearing

on May 16, 2022, and entered written orders the next day, May 17, 2022.

The trial court's interlocutory injunction "applies until a final judgment in

th[e] case or six months have passed after (1) the [DOC] lifts all COVID-19

restrictions on visitation and restores normal visitation procedures and

[after] (2) a Covid-19 vaccine is available to all members of the public."

The State appealed to the Supreme Court of Georgia. The Supreme

Court unanimously concluded that the Agreement constituted a "valid

written contract between the parties[.]" *State v. Fed. Def. Program, Inc.*, 315

Ga. 319, 344 (2022) . The Supreme Court further held that the trial court had

not abused its discretion in rejecting the State's "substantial compliance"

argument or in concluding that the Federal Defender had shown a substantial likelihood of success on the merits of its breach of contract claim. *Id.* at 349-52.

In a concurrence on behalf of all six Justices who heard the case, Justice Bethel emphasized that while "it may prove inconvenient, uncomfortable, or undesirable to the State, … *everyone* should be able to count on the State to honor its word. … The People of Georgia, who are the very source of the State's sovereignty, are owed a government that honors its commitments." *Id.* at 356 (Bethel, J., concurring, joined by Boggs, C.J., and Ellington, McMillian, LaGrua, and Colvin, JJ.) (emphasis in original). He concluded:

> In a society governed by the rule of law, courts must entertain lawfully filed cases and vindicate rights of parties, as defined by the law. And if the law allowed the State to avoid fulfilling the promises it made here, this Court would be bound to allow that. For the reasons explained in the opinion of the Court, however, the law thankfully does not allow that avoidance here. It's a shame anyone thought it appropriate to ask.

*Id.*

The parties then proceeded to discovery in the trial court before suspending their discovery schedule and engaging in settlement discussions. Those discussions occurred over a matter of months and were actively moving forward until as recently as three weeks ago. It was only on February 27, 2024, that counsel for the Attorney General unilaterally informed counsel for the Federal Defender that further settlement negotiations were not worthwhile. Two days later, on February 29, 2024, the Attorney General procured an execution order for Mr. Pye.

C.    **Standard of Review**

This Court reviews the grant of a motion to dismiss under Rule 12(b)(6) *de novo*, accepting the allegations in a plaintiff's complaint as true and construing them in the light most favorable to the plaintiff. *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1262 (11th Cir. 2004).

## SUMMARY OF THE ARGUMENT

The Equal Protection Clause guarantees that the State will treat similarly situated individuals equally. And the Due Process Clause mandates "fundamental fairness" when the State extends procedural benefits to prisoners, even where those benefits or protections are not

11

themselves constitutionally required. Here, however, in wielding its most solemn and awesome power—the power to execute one of its own citizens—the State has eschewed both equality and fairness. By pursuing and obtaining an execution warrant for Mr. Pye, Defendants have now created two classes of death row prisoners in Georgia: (1) those whom the State agrees cannot be executed until it can satisfy the conditions necessary to ensure adequate representation in clemency proceedings and pre-execution litigation and (2) an identically situated class of death-row prisoners who were not granted those protections. Mr. Pye is of the latter class of prisoners, and he is scheduled to be executed without the benefit of the protections afforded to the former class. This arbitrary and disparate treatment—particularly in a matter of life and death—is odious to the Constitution, and this Court should not countenance it.

## ARGUMENT AND CITATION OF AUTHORITY[3]

I.    THE DISTRICT COURT MISCHARACTERIZED MR. PYE'S EQUAL
      PROTECTION CLAIM AS A "CLASS-OF-ONE" CLAIM AND THEN
      MISAPPLIED THE LAW.

As a general matter, to state a claim for relief under the Equal

Protection Clause, a plaintiff must first "show that the State will treat him

disparately from other similarly situated persons." *Arthur v. Thomas*, 674

F.3d 1257, 1262 (11th Cir. 2012) (quotation omitted). A plaintiff must also

show that such disparate treatment either burdens a fundamental right,

targets a suspect class, or is not rationally related to a legitimate

government interest. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473

---

[3] The district court addressed Mr. Pye's Complaint through its discussion
of his accompanying motion for a TRO. *See* Order at 29 ("The above
discussion regarding [Mr.] Pye's failure to establish a substantial likelihood
of success on the merits of his claim so as to entitle him to a TRO also
demonstrates that [Mr.] Pye has failed to state a claim for relief."). This is
also error. The TRO standard is dramatically different than the standard
under Rule 12(b)(6). Indeed, a complaint should be dismissed under Rule
12(b)(6) only where the facts alleged fail to state even a "plausible" claim
for relief. *Ashcroft v. Iqbal*, 566 U.S. 662, 667 (2009); *see* Fed. R. Civ. P.
12(b)(6). And the district court's conclusory 12(b)6) findings, including, for
instance, that "Pye has not alleged that the State did not have a rational
basis for excluding him from the terms of the Agreement" are plainly
wrong. Order at 29.

U.S. 432, 440 (1985).

In certain situations, however, the Supreme Court has instructed that a different, more stringent standard applies. Those cases, referred to as "class of one" equal protection claims, arise where "the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out" for disfavored treatment. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Such challenges differ from "typical[]" equal protection claims, which are "concerned with governmental classifications that affect some group of citizens differently than others." *Engquist*, 553 U.S. at 601.

Mr. Pye's Complaint alleged improper discrimination against a class of individuals, not just against himself. Specifically, the Complaint alleged that Defendants created one class of death row prisoners who cannot be executed until the conditions in the Agreement have been satisfied and another "disfavored class of death row prisoners, one without the baseline guarantee of adequate representation that is being provided to others." Doc. 1 at 6. Defendants *also* recognized such a classification. *See* Doc. 8 at 19 ("the agreement only applies to a limited sub-set of death-eligible

prisoners"). The fact that Mr. Pye is the first member of the disfavored class to face execution does not change the fact that he is alleging class-based discrimination. Despite plainly setting forth a traditional equal protection claim, the Order applies the class-of-one framework to Mr. Pye's claim. Order at 9-18.[4] That is a clear error of law.

The court's error appears to arise from its conflation of two distinct equal protection concepts. The court notes that Mr. Pye's claim is "not standard" and must be a "class-of-one" claim, because "the disparate treatment he alleges is not based on a suspect classification." Order at 13 n.5. But the relevance of a suspect classification here is only as to the level of scrutiny applied to the State's actions. Not all "standard" equal protection claims need be based on *suspect* classifications; a plaintiff must simply show a *class*-based distinction. *See, e.g.*, *Ross v. Moffitt,* 417 U.S. 600, 609 (1974) ("Equal protection ... emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably

_____

[4] This error is particularly baffling as the district court informed counsel for Mr. Pye at the March 15 hearing that it would not interpret the Complaint as raising a "class-of-one" claim.

indistinguishable."); *Engquist*, 553 U.S. at 601 (plaintiff usually must allege "class-based discrimination"). *See also Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 922 (11th Cir. 2018) (applying general equal protection principles even though claim did not allege a suspect classification). The Order applied the wrong framework to Mr. Pye's claim and that alone warrants reversal.[5]

The Order also independently misapplied each element of the Equal Protection analysis. Mr. Pye will address each in turn.

A.    **Mr. Pye is Similarly Situated to the Favored Class of Death Row Prisoners.**

The State has undeniably conferred the benefit of the Agreement on those death row prisoners whose petitions for rehearing or rehearing en banc were denied by this Court while Georgia's Judicial Emergency Order

---

[5] The district court made one additional clear error of law worth clarifying. In footnote 3 of its Order, the court appears to conflate equal protection claims raising class-based distinctions with class actions. Counsel for Mr. Pye has never asserted that he is attempting to seek relief on behalf of all death-row inmates. For proof of that, look only to the requested relief in his Complaint. What he asserted below, and continues to assert, is that Defendants have made class-based distinctions in this case which make the "class-of-one" analysis inappropriate.

16

was in place. Doc. 1-1 at 4-5. But at the same time, Defendants have refused

to grant that benefit to otherwise identically situated death-row prisoners,

like Mr. Pye, whose rehearing petitions were denied or may in the future

be denied after the Judicial Emergency Order was lifted.

The Order concluded, however, that Mr. Pye is *not* similarly situated

to the protected class of death row prisoners because he is not covered by

the Agreement. Order at 15. This argument is not "somewhat circular," as

the district court conceded; it is *entirely* circular. The source of the

challenged classification itself—whether that be race, gender, or the timing

of this Court's decisions in a death row prisoner's case—is not a sufficient

basis to determine that the disfavored class is not similarly situated to the

favored class. That the State chose to classify Mr. Pye separately is not,

itself, a basis for treating him differently. *See, e.g.*, *Nordlinger v. Hahn*, 505

U.S. 1, 10 (1992) ("[The Equal Protection Clause] keeps governmental

decisionmakers from treating differently persons who are in all *relevant*

respects alike.") (emphasis added).

And, to be clear, Mr. Pye's constitutional challenge is premised on

Defendants' position that he will not receive the benefits of the Agreement.

17

That is the constitutional violation here. The State has conferred critical procedural protections on one class of death row prisoners through an Agreement and has refused to extend those protections to other prisoners, solely because of the timing of this Court's rulings on those prisoners' petitions for rehearing. But such timing is not a relevant distinction that renders Mr. Pye differently situated from other prisoners. Regardless of the timing of this Court's rulings in their cases, all death row prisoners currently face the identical problems stemming from post-pandemic restrictions on, among other things, legal visitation. And Mr. Pye and all other death row prisoners likewise have an identical interest in receiving representation for clemency proceedings and pre-execution litigation that is unimpaired by those post-pandemic restrictions. But despite being identically situated in all relevant and material respects, Mr. Pye and those in the disfavored class will *not* receive that unimpaired representation before facing execution.

**B. Mr. Pye's Claim is entitled to heightened scrutiny.**

Mr. Pye and all those on death row retain a fundamental right to life under the Fourteenth Amendment to the United States Constitution. *See*

18

*Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J.,

concurring in part and concurring in the judgment)[6] ("A prisoner under a

death sentence remains a living person and consequently has an interest in

his life."). *Cf. Arthur v. Comm'r, Alabama Dep't of Corr.*, 680 F. App'x 894,

916–17 (11th Cir. 2017) (unpublished) (Wilson, J., dissenting)

("fundamental right[s] … exist[] until a death row prisoner's life is taken[,]

[t]he right does not vanish when a prisoner enters the execution chamber

and the state begins to tinker with the machinery of death")

　　"[T]he Supreme Court [has] instructed that a fundamental right must

be 'objectively, deeply rooted in this Nation's history and tradition' and

'implicit in the concept of ordered liberty, such that neither liberty nor

justice would exist if [the right] were sacrificed." *Williams v. Pryor*, 240 F.3d

944, 955 (11th Cir. 2001) (quoting *Washington v. Glucksberg*, 521 U.S. 702,

720-21 (1997)).  And while the Supreme Court, in a long line of cases, has

identified numerous fundamental rights and liberty interests, including the

---

[6] As this Court has held, Justice O'Connor's concurring opinion in *Woodard*
provided the holding for that case. *See Gissendaner v. Comm'r, Georgia Dep't
of Corr.*, 794 F.3d 1327, 1331 (11th Cir. 2015)

rights to marry, have children, and use contraception, the touchstone for determining fundamental rights has always been "the specific freedoms protected by the Bill of Rights[.]" *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *see also Plyler v. Doe*, 457 U.S. 202, 218 n.15 (1982) ("In determining whether a class-based denial of a particular right is deserving of strict scrutiny under the Equal Protection Clause, we look to the Constitution to see if the right infringed has its source, explicitly or implicitly, therein."). There is no right in the Bill of Rights more fundamental or sacred than the right to "life" and, with it, the right to be free from the arbitrary "depriv[ation]" of "life [and] liberty" included in the Fifth and Fourteenth Amendments.

The district court acknowledged the fundamental right to life but found it inapplicable here because Mr. Pye "is due to be executed at some point, and nothing that the State has done in relation to securing a death warrant or refusing to provide him the benefits of the Agreement has increased the likelihood that he will be executed eventually." Order at 11. But that misses the point. As the court itself recognized, "the right *to continue living* is fundamental." *Id.* (emphasis added). Each day of life

20

matters. And while Mr. Pye is subject to the death penalty "at some point,"
Defendants' disparate treatment here has not only increased the likelihood
that he will be executed, by withholding from him the benefit of the
Agreement, but Defendants have also increased the likelihood that he will
be executed *sooner* than he otherwise would have been if he had the same
procedural protections enjoyed by other prisoners.[7] This disparate
treatment undeniably constitutes an infringement of Mr. Pye's
fundamental right to continue living and is subject to strict scrutiny.

The district court further held that Mr. Pye's claims for relief, relating
to his preparation for clemency proceedings and pre-execution litigation,
do not warrant heightened scrutiny because they "only tangentially, if at
all, implicate his fundamental right to live." Order at 12. But that assertion
is difficult to square with *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996). In *M.L.B.*, the

---

[7] Defendants have made much of the fact that it has been nearly a year
since this Court issued its final ruling in Mr. Pye's post-conviction
proceedings. According to Defendants, this has provided Mr. Pye with
more than enough time to prepare for clemency and pre-execution
litigation. But the point of this case is that Mr. Pye has undeniably had far
less time than the prisoners protected by the Agreement, some of whom
received their final ruling from this Court more than three years ago. That
inequality is the constitutional infirmity here.

Supreme Court assessed a state's civil appeal fee requirements, a scheme normally assessed only for rationality. The Court nevertheless held that a case "involving the State's authority to sever permanently a parent-child bond, demands the close consideration the Court has long required when a family association so undeniably important is at stake." *Id.* at 116–17. The fee requirement at issue in *M.L.B.* was no less "tangential" to the important right ultimately at stake than Defendants' disparate treatment is to Mr. Pye's right to life. And here, where the stakes are even higher than *M.L.B.*, some form of heightened scrutiny, at the very least, is demanded.

### C. Defendants cannot even satisfy rational basis review.

Rational basis review is deferential, but it is not "toothless." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981); *see also Zobel v. Williams*, 457 U.S. 55, 65 (1982) (finding equal protection violation under rational basis review because the State "show[ed] no valid state interests which are rationally served by the distinction it makes between citizens who established residence before 1959 and those who have become residents since then"). Thus, even assuming, *arguendo*, that the rational basis standard applies here, Defendants' disparate treatment of Mr. Pye and the other death row

prisoners in the disfavored class from "those who have committed

intrinsically the same quality of offense[,]" *Skinner v. State of Oklahoma ex*

*rel. Williamson*, 316 U.S. 535, 541 (1942), is without any legitimate

governmental or penological interest and must fail.

The district court concluded that "the State clearly has a valid basis

for drawing a line between the inmates covered and not covered by the

Agreement." Order at 17. But as noted *supra*, this tautological argument is

unpersuasive. The distinction between the protected and unprotected

classes of death row prisoners is not rational simply because the State has

made a distinction between the protected and unprotected classes. And

none of the district court's other attempts at a justification—the fact that the

"pandemic was an extraordinary event," or that "the state courts have

already ruled that Pye is not covered by the Agreement," or that "a ruling

in his favor would [] have a chilling effect on the State's willingness to

enter into such agreements in the future"[8]—fare any better. *Id.* at 17-18. The

_____

[8] This justification, in particular, should not carry *any* weight in the analysis
of whether a State has committed a constitutional violation.

23

only question that matters is whether there is a rational reason for making

the execution of one class of death row prisoners contingent on first

ensuring adequate conditions for representation in clemency proceedings

and pre-execution litigation and not offering those same guarantees to Mr.

Pye and the disfavored class. There is none.

At the risk of stating the obvious, the timing of Mr. Pye's rehearing

petition in this Court provides no reasonably conceivable basis for the

classification of who is, and who is not, entitled to the critical procedural

protections guaranteed in the Agreement before the extinguishment of

their life.[9] What matters is that the harms the Agreement's conditions were

---

[9] Mr. Pye's appeal was initially decided by a panel of this Court on April 27, 2021, *during* the pendency of the statewide judicial emergency. *Pye v. Warden, Ga. Diagnostic Prison,* 853 Fed. Appx. 548 (11th Cir. 2021) (vacated). That judicial emergency order expired on June 30, 2021. And the decision granting habeas relief to Mr. Pye was later vacated by the *en banc* court after the expiration of the statewide judicial emergency order. *See Pye v. Warden, Ga. Diagnostic Prison,* 50 F.4th 1025 (11th Cir. 2022); *Pye v. Warden, Ga. Diagnostic Prison,* 2023 WL 386289 (11th Cir. 2023). Mr. Pye's final petition for rehearing before this Court was denied on March 9, 2023. In other words, the timing of Mr. Pye's initial panel opinion in this Court fell precisely within the timeframe explicitly identified in the Agreement. The only basis Defendants have asserted for not affording Mr. Pye the same rights as the protected class of prisoners is that he was initially *granted*

designed to protect against still exist today. Significant restrictions on legal

visitation for death row prisoners continue to hinder counsel's

representation of all prisoners equally, regardless of when this court ruled

on their petitions for rehearing.[10]

—————————————————

sentencing phase relief by this Court. That is not a principled way of distinguishing *anything*, let alone who will live or die.

[10] One final error. The Order erroneously suggests the existence of a prejudice standard—faulting Mr. Pye for not asserting how "he would benefit" if he received "the additional time that he would get if he were covered by the terms of the Agreement[,]" before proceeding to erroneously assert that Mr. Pye has not "suffered an injury in fact" that "would be redressed if he were granted relief." Order at 29, 30-31 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

   As an initial matter, *Lujan* deals with Article III standing. And standing is a jurisdictional question, not a Rule 12(b)(6) issue. More fundamentally, the Supreme Court has already clearly resolved the question of standing in the context of equal protection:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the

II.    **THE DISTRICT COURT DENIED A SUBSTANTIVE DUE PROCESS CLAIM THAT MR. PYE NEVER RAISED.**

The Supreme Court, applying due process principles, has held, in a long line of cases, that a State cannot arbitrarily or unequally apply a protection or right, even where that protection or right itself is not constitutionally required. In *Griffin v. Illinois*, for instance, the Court addressed an Illinois law which required criminal defendants, whether indigent or not, to purchase their own transcript for appeal. 351 U.S. 12, 14 (1956). Applying both the Due Process and Equal Protection Clauses, the Court concluded that while "[i]t is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all[,] … that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants[.]" *Id.* at 18.

_____

ultimate    inability    to    obtain    the    benefit.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). The unequal treatment, in other words, is the injury. And this constitutional violation is clearly redressable. *See id.* at 666 n.5 ("a judicial decree directing the city to discontinue its program would 'redress' the injury").

26

In *Evitts v. Lucey*, the Court similarly rejected the state's argument that whatever a state does or does not do on appeal is of no concern under the Due Process Clause merely because a State need not provide a system of appellate review as of right at all. 469 U.S. 387, 400 (1985). The Court held, to the contrary, that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Id.* at 401. *See also Morrissey v. Brewer*, 408 U.S. 471, 481-84 (1972) (the State has great discretion in setting policy as to parole decisions, but must nonetheless make those decision in accordance with the Due Process Clause); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) (analyzing whether the state's postconviction proceedings comported with "the fundamental fairness mandated by the Due Process Clause"); *Woodard*, 523 U.S. at 288 (O'Connor, J., concurring) (concluding that procedural safeguards do apply in clemency proceedings); *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) ("When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its

27

vindication—and federal courts will review the application of those constitutionally required procedures.").

Relying on this well-established precedent, Mr. Pye argued below that when Defendants extended critical procedural protections to a class of death row prisoners, guaranteeing members of that class the ability to prepare for and be adequately represented in their clemency proceedings and pre-execution litigation, they were required to act in accord with the Due Process Clause. The District Court, *sua sponte*, addressed Mr. Pye's procedural due process claim under a *substantive* due process framework, concluding that Defendants' failure to extend these procedural protections to Mr. Pye and the rest of the disfavored class did not "shock the conscience" or deny Mr. Pye "a fundamental right." Order at 20, 21.

But that is not the claim that Mr. Pye has raised, and that framework is obviously inappropriate here. The phrase "substantive due process" did not appear in Mr. Pye's Complaint or Defendants' response. To the contrary, the Complaint clearly challenged Defendants' conduct by referencing the line of *procedural* due process cases cited herein. *See* Doc. 1 at 25-29.

28

And when analyzing a claim for *procedural* due process, this Court must ask whether the plaintiff has established the deprivation of a constitutionally protected liberty or property interest. *See, e.g., Worthy v. City of Phenix City, Alabama*, 930 F.3d 1206, 1223 (11th Cir. 2019). Here, Mr. Pye clearly has established such a liberty interest in his clemency proceedings and pre-execution litigation. *See, e.g., Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring) ("I do not, however, agree with the suggestion in the principal opinion that, because clemency is committed to the discretion of the executive, the Due Process Clause provides no constitutional safeguards."); *Yates v. Aiken*, 484 U.S. 211, 218 (1988) (post-conviction proceedings are subject to due process protections). Moreover, Mr. Pye also has a separate *state* liberty interest, created by Defendants' Agreement, in adequate representation for all end-stage litigation. *Cooke*, 562 U.S. at 220 ("Whatever liberty interest exists is, of course, a *state* interest created by California law. There is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners. When, however, a State creates a liberty interest, the Due Process

29

Clause requires fair procedures for its vindication—and federal courts will review the application of those constitutionally required procedures."). Where, as here, Defendants' deprivation of Mr. Pye's liberty interests results from arbitrary line-drawing, that inadequate process violates the Constitution.

The district court's conclusion that Mr. Pye's claim "does not implicate a … recognized liberty interest" because he "has not alleged that he will be entirely denied access to clemency" is therefore plainly incorrect. Order at 23. While Mr. Pye has not challenged Georgia's *pre-existing* clemency or post-conviction procedures, his challenge to Defendants' arbitrary deprivation of the Agreement's process and benefits meant to ensure adequate representation and preparation for those proceedings necessarily implicates those same liberty interests. *Cf. Harbison v. Bell*, 556 U.S. 180, 193 (2009) ("Congress' decision to furnish counsel for clemency proceedings demonstrates that it, too, recognized the importance of such process to death-sentenced prisoners[.]"). The deprivation here of Mr. Pye's federal and state liberty interests in *both* clemency proceedings and pre-execution litigation—the critical final stages of the process that precedes an

30

official deprivation of life—is not, therefore, similar to a "loss of telephone privileges." Order at 22 n.8.

One final point. The Order takes aim at Mr. Pye's assertion that the conditions included in the Agreement were designed to solve not only for the backlog of potentially warrant eligible prisoners but also to ensure that the capital defense bar was able to adequately represent their clients in clemency and pre-execution proceedings, calling this argument "at best, a gross exaggeration." Order at 24. The district court's attempt to rewrite the context and history of the Agreement, characterizing it, instead, as "simply provid[ing] a timeline for the resumption of executions"[11]—is inconsistent with both the language of the Agreement itself and the opinion of the Supreme Court of Georgia and must be rejected.

First, the Agreement. After setting out the three conditions which must be satisfied before the resumption of executions, it states, "*[a]fter these Conditions are met*, and no earlier than August 1, 2021, our office intends to request an execution warrant for Billy Raulerson. *We will provide Raulerson's*

---

[11] To the extent this could be construed as a fact-finding, it is, as demonstrated *infra*, clearly erroneous.

*counsel with notice of at least three months after the three-above conditions are met before pursuing an execution warrant.*" Doc. 1-1 at 4 (emphases added). Mr. Raulerson was identified as first in line for an execution warrant because his appeals had run out in March 2020. Critically, however, Mr. Raulerson was represented by private *pro bono* counsel in Washington D.C., counsel who was not otherwise involved in Georgia capital litigation.

If, as the district court suggested, the Agreement was intended solely to solve for the potential backlog issue and to "provide[] a timeline for the resumption of executions"—and was uninterested in ensuring that the capital defense bar had adequate access to their clients before the resumption of executions—then there would have been no reason to condition the State's ability to pursue an execution warrant for Mr. Raulerson on *anything*. At the time of the Agreement, counsel for Mr. Raulerson was already aware that he was warrant eligible and counsel had no other clients to prioritize.

But of course, the Agreement was *not* solely designed to resolve timing considerations relating to the backlog of execution-eligible prisoners. The Agreement was *also* intended to ensure that death row

prisoners facing execution received adequate representation for their

clemency proceedings and pre-execution litigation. This is precisely why

the Agreement provides that executions will not resume until, among other

things, legal visitation returns to normal. Doc. 1-1 at 4. If the Agreement

had simply been meant to address the backlog, it would have been limited

to the notice procedures and would not have included the substantive

conditions required to resume executions following the pandemic.

The Supreme Court of Georgia's decision confirms this. The Court

repeatedly recognized that ensuring the capital defense bar was able to

adequately represent their clients facing execution was a core concern

animating the Agreement:

> In the fall of 2020, in response to an invitation from
> the Task Force, the Georgia Association of Criminal
> Defense Lawyers ("GACDL") prepared draft
> legislation to address the capital defense bar's
> concerns about how the restrictions necessitated by
> COVID-19 had resulted in a backlog of execution-
> eligible inmates. This backlog not only hindered
> capital defense counsel's ability to prioritize
> clemency investigations for the growing number of
> inmates eligible for execution but also impaired
> counsel's ability to meet with their clients and
> conduct investigations in order to prepare for
> clemency proceedings and adequately represent
> their clients.

*State v. Fed. Def. Program, Inc.*, 315 Ga. 319, 320 (2022); *see also id* at 322 ("The Appellees contended that these restrictions seriously impaired the ability of capital defenders, including lawyers at the Federal Defender, to effectively represent their clients in clemency and other pre-execution proceedings."). In fact, in rejecting the State's argument that it had provided *Woodard*-sufficient process, the Court noted that such an argument "fails to take into account the effect of the COVID-19 restrictions on counsel's investigations and preparations." *Id.* at 347.

*    *    *    *

The State and the Federal Defender entered into an Agreement which specified the three conditions that must occur before the resumption of executions in Georgia. These conditions were chosen, by the State, to account for the specific concerns identified by the capital defense bar at that time. The promise inherent in the Agreement, in other words, was that executions would not resume until conditions allowed for death row prisoners to receive adequate representation in their clemency proceedings

34

and pre-execution litigation. Those conditions *still have not been satisfied*.[12]

And yet, Defendants nevertheless pursued an execution warrant for Mr.

Pye.

    Once the State "opt[ed] to act in [this] field," by recognizing and

extending critical procedural protections for certain death row prisoners, it

was required to "act in accord with … the Due Process Clause." *Lucey*, 469

U.S. at 401. It has not. Defendants' extension of critical procedural

protections in clemency proceedings and pre-execution litigation to some

_____

[12] In argument before the District Court, Defendants asserted that the conditions had been satisfied and the only reason that the State had not attempted to execute those covered by the Agreement was that the Fulton County Superior Court's preliminary injunction remains in place. But that injunction is, somewhat unusually, designed to end once the Agreement's conditions are satisfied. *Fed. Def. Program, Inc.*, 315 Ga. at 323 ("The trial court's interlocutory injunction 'applies until a final judgment in th[e] case or six months have passed after (1) the [DOC] lifts all COVID-19 restrictions on visitation and restores normal visitation procedures and [after] (2) a Covid-19 vaccine is available to all members of the public."). In other words, if the Agreement's conditions were actually satisfied, then the injunction would end. But of course, it has not, both because Georgia's DOC has not resumed normal visitation and because the COVID-19 vaccine is not currently available to "all members of the public." The favored class of death-row prisoners continues to enjoy the procedural protections extended by the State not because of an injunction, but because the Agreement remains in effect. Under the U.S. Constitution, Mr. Pye should be receiving those same critical procedural protections.

death row prisoners, but not others, like Mr. Pye, violates the Due Process Clause of the United States Constitution.

## CONCLUSION

Mr. Pye respectfully asks this Court to vacate the district court's March 15 Order granting Defendants' motion to dismiss, and remand to the district court with instructions to grant Mr. Pye the injunctive relief he has sought while these proceedings remain pending.

*/s/ Nathan Potek*
Nathan Potek (Ga. 747921)
Federal Defender Program Inc.
101 Marietta Street, NW, Suite 1500
Atlanta, GA 30303
(404) 688-7530
Nathan_Potek@fd.org
COUNSEL FOR WILLIE PYE

<u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

This is to certify that the foregoing brief is in compliance with Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in Book Antiqua 14 point, a proportionally-spaced typeface, using the Microsoft Word 365 processing software.  This brief does comply with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 6,904 words.  Finally, on the date set forth below, counsel uploaded this brief to the Court's web site, which promptly served opposing counsel:

> Sabrina Graham
> sgraham@law.ga.gov
> Attorney General's Office
> 40 Capitol Square, S.W.
> Atlanta, GA 30334

Dated this 18th day of March 2024.

> */s/ Nathan Potek*
> Nathan Potek (Ga. 747921)
> Counsel for Mr. Pye

37